## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **ROGER D. TUCKER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **Case No. 10-CV-799-PJC** |
| | ) | |
| **MICHAEL J. ASTRUE, Commissioner of the** | ) | |
| **Social Security Administration,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## OPINION AND ORDER

Claimant, Roger D. Tucker ("Tucker"), pursuant to 42 U.S.C. § 405(g), requests judicial review of the decision of the Commissioner of the Social Security Administration ("Commissioner") denying his applications for disability insurance and supplemental security income benefits under the Social Security Act, 42 U.S.C. §§ 401 *et seq*.  In accordance with 28 U.S.C. § 636(c)(1) and (3), the parties have consented to proceed before a United States Magistrate Judge.  Any appeal of this order will be directly to the Tenth Circuit Court of Appeals.  Tucker appeals the decision of the Administrative Law Judge ("ALJ") and asserts that the Commissioner erred because the ALJ incorrectly determined that Tucker was not disabled.  For the reasons discussed below, the Court **AFFIRMS** the Commissioner's decision.

### Claimant's Background

Tucker was 48 years old at the time of the hearing before the ALJ on September 5, 2008.  (R. 23).  At the hearing, Tucker amended the onset date of his disability to August 18, 2005.  (R. 22-23).  Tucker had a high school education.  (R. 24).  Tucker had worked as a welder and in construction work.  (R. 24-25).

Tucker testified that he was unable to work because he could not handle pressure and because he had outbursts of anger.  (R. 26).  Tucker said that he would "blow up" if anyone told him what to do or if they argued with him.  *Id.*  Tucker testified that at one job he yelled and threw things at his boss, but his boss tolerated his actions because they had known each other since childhood.  *Id.*  He had once walked off a job he had for nine-and-a-half years because he had gotten mad.  *Id.*  He quit his last job because he was unwilling to work for a boss younger than he.  *Id.*

Tucker said that his mental impairments caused him the greatest amount of difficulty.  (R. 36).  He did not like the way his impairments made him feel.  (R. 34).  He felt that they caused him problems with the level of his motivation and his anger.  (R. 31, 34).  He experienced outbursts of anger.  (R. 31).  After he had an outburst of anger, he would lock himself in his apartment and would not see anyone.  *Id.*  He described an occasion where he had thoughts of hurting his attorney because he had gotten mad at him.  (R. 28).

Tucker suffered panic attacks that made him feel as if he was having a heart attack.  (R. 27, 32).  He said that his attacks lasted up to 20 minutes.  (R. 33).  His heart would race, and his head would feel hot.  (R. 32).  He would lie on his bed until he felt his symptoms had subsided.  (R. 33).  Nothing specific caused Tucker to have a panic attack.  *Id.*

Tucker felt that his mental impairments affected his ability to comprehend and to remember.  (R. 34-35).  He could not remember the process to pay when he rode a bus.  (R. 32).  He was able to watch a two-hour movie, and he was able to read.  (R. 35)

Every day Tucker checked his door after he woke to see if he had been left a note.  (R. 27).  Throughout the day he continually checked his patio door and the peephole in his door to see if there was anyone outside.  (R. 27-28).  He felt everyone looked at him all the time.  (R.

32).  Tucker said that he continually worried and fixated on one subject.  (R. 28).  His worries and fixations kept him up at night.  (R. 27, 30, 36).  Tucker had difficulty falling and staying asleep, but he generally slept four to five hours.  (R. 30)

Tucker did not want to attend the hearing, so a friend forced him to attend.  (R. 27).  He was worried and nervous about attending the hearing.  (R. 29).  He had been unable to sleep or to concentrate for a few days prior to the hearing.  (R. 29, 36).

Tucker sought treatment for substance abuse in 2005.  (R. 33).  He said that he still had a compulsion to drink a couple of beers*.  Id.*  His fear of relapsing allowed him to stop drinking after a couple of beers.  (R. 33-34).  He was told by his doctor not to mix alcohol with his medications.  (R. 33).  His blood pressure medication had to be increased because he drank alcohol.  *Id.*  Tucker said that his mental problems were unrelated to his use of alcohol.  (R. 34).  His mental condition continued although he had decreased his use of alcohol.  *Id.*

Tucker received medications from Family & Children's Services ("FCS").  (R. 28).  He was treated with a medication to help his anxiety and his sleep, but he only used it two nights a week because he was told the medication was addictive.  (R. 30).  He experienced a mild gastrologic problem from his medication.  (R. 29).  Tucker said that medications had helped him to maintain a job for a while, but he was unable to keep it because of the pressure he felt.  (R. 29).

Arthritis affected Tucker's ankles, knees, and elbows.  (R. 34).  His arthritis was worse with cold weather.  *Id.*

Hazem Sokkar, M.D., provided Tucker psychiatric services in 2004 and 2005.  (R. 151-55).  There are hand-written notes that appear to show that Tucker was seen in October 2004 and November 2004.  (R. 151).  While the notes are not completely legible, they appear to mention

3

anxiety, and they appear to reflect that Xanax was prescribed. *Id.*

On January 26, 2005, Tucker told Dr. Sokkar that he had stopped taking Xanax the month before and had begun drinking alcohol. (R. 155). Dr. Sokkar discussed the risk of discontinuing Xanax. *Id.* Tucker stated that he would no longer use alcohol and would restart taking his medication. *Id.* Dr. Sokkar diagnosed Tucker with generalized anxiety disorder and intermittent explosive disorder. *Id.*

At Tucker's March 1, 2005 appointment with Dr. Sokkar, he said that he did not drink and that his compliance with his Xanax treatment helped him abstain. (R. 154). Dr. Sokkar diagnosed Tucker with generalized anxiety disorder, intermittent explosive disorder, and alcohol abuse. *Id.*

Tucker saw Dr. Sokkar again on April 5, 2005 and said that he was working 60 hours a week at a new job. (R. 153-54). Tucker reported that Xanax continued to help control his anger, and it kept him from drinking. *Id.* Dr. Sokkar wrote that Tucker's alcohol abuse was in remission. *Id.* He refilled Tucker's prescription for Xanax. *Id.*

On May 5, 2005, Tucker told Dr. Sokkar that he continued to benefit from Xanax and that he continued to abstain from alcohol. (R. 150-55). Tucker reported that he was upset that he could not find a job. *Id.* Dr. Sokkar continued Tucker's prior diagnosis. *Id.*

Emergency personnel transported Tucker to Hillcrest Medical Center ("Hillcrest") on July 5, 2005 for acute psychosis and withdrawal syndrome. (R. 156-90). Tucker's thought pattern was unorganized, and his speech was disjointed and rambling. (R. 161). He was agitated, uncooperative, and thrashing around. (R. 161, 164, 166). He was talking to himself, and he was hallucinating and delirious. (R. 163, 168-69). Tucker's family member reported that Tucker had been acting erratically for approximately two weeks. (R. 160, 163). It was additionally reported

4

that Tucker had suffered a seizure and had sustained injuries.  (R. 160).  Tucker reportedly drank a case of beer daily, but had stopped drinking four days earlier.  (R. 169).  Drug and blood alcohol screens were negative for use of drugs and alcohol.  (R. 162, 182, 188, 190).

Roderick N. Purdie, M.D. conducted a psychiatric consultation on July 8, 2005 while Tucker was hospitalized at Hillcrest.  (R. 158, 163-165).  Dr. Purdie diagnosed Tucker on Axis I[1] with anxiety, not otherwise specified, and questionable psychiatric history.  (R. 164).  He deferred an Axis II diagnosis.  (R. 165).  Tucker's Global Assessment of Functioning ("GAF")[2] was 25 with a baseline of 60-70.  *Id.*

The Hillcrest discharge summary of July 11, 2005 reflects that Tucker had made a significant mental recovery during his hospitalization.  (R. 158).  Tucker's discharge diagnosis states that Tucker had alcohol and benzodiazepine withdrawal with secondary seizures and hallucinations.  (R. 157).

On July 13, 2005 Tucker was again admitted to Hillcrest.  (R. 191-96).  Tucker had uncontrolled tremors and complained of withdrawal from Xanax.  (R. 192).  He was treated for

---

[1]The multiaxial system "facilitates comprehensive and systematic evaluation."  American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 27 (Text Revision 4th ed. 2000).

[2]The GAF score represents Axis V of the multiaxial assessment system.  *See* American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 32-36 (Text Revision 4th ed. 2000).   A GAF score is a subjective determination which represents the "clinician's judgment of the individual's overall level of functioning." *Id*. at 32.  The GAF scale is from 1-100. A GAF score between 21-30 represents "behavior is considerably influenced by delusions or hallucinations or serious impairment in communication or judgment . . . or inability to function in almost all areas." *Id*. at 34.  A score between 31-40 indicates "some impairment in reality testing or communication . . . or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood."  *Id*.   A GAF score of 41-50 reflects "serious symptoms . . . or any serious impairment in social, occupational, or school functioning." *Id*.

symptoms of withdrawal and discharged with a prescription to refill his medication.  (R. 196).

Paramedics transported Tucker to Hillcrest on August 5, 2005, for a grand mal/tonic-clonic seizure.[3]  (R. 198).  He had sustained injuries during the seizure.  (R. 198, 200).  Tucker reported that he had been out of his anti-seizure medication, so he had used his friend's medication.  (R. 200).  Personnel noted that Tucker had alcohol on his breath.  *Id.*  He was diagnosed with benzodiazepine withdrawal.  (R. 199).  Tucker was given Ativan, an anti-seizure medication, and discharged with a prescription to continue its use.  (R. 201, 203-04).

The first FCS record is a treatment plan signed on October 19, 2005.  (R. 214-19).  Tucker reported problems with anxiety, depression, and isolating issues.  (R. 214).  Tucker was diagnosed on Axis I with generalized anxiety disorder and alcohol abuse.  (R. 222).  There was no diagnosis on Axis II.  *Id*.  His GAF was scored as 33.  (R. 224).

Tucker saw a case manager at FCS on December 1, 2005, and he was noted as being fairly groomed and friendly, with a bright affect.  (R. 232-33).  Tucker was given assistance with housing and food resources.  (R. 231-33)*.*

Tucker was described as sad and dysphoric by his FCS case manager on January 17, 2006.  (R. 229-30).  Tucker also saw a medical doctor at FCS on January 17, and he reported that he had run out of his medications 2 weeks earlier.  (R. 239).  He said that he had done better on the medication, and the physician prescribed a resumption of Celexa.  *Id.*

On February 28, 2006, Tucker saw his case manager and his physician at FCS.  (R. 225, 237).  Tucker told the physician that he was still having panic attacks and anxiety.  (R. 237).  The physician noted that Tucker had a glassy-eyed appearance, with a flushed face.  *Id.*  In response to

---

[3]Tonic-clonic seizure is "a spasm or seizure consisting of a convulsive twitching of the muscles."  Dorland's Illustrated Medical Dictionary 1962 (31st ed. 2007).

a question from the physician, Tucker reported daily alcohol use, and said that he had been drinking for many years, with episodes of sobriety of up to three months. *Id.* He believed that his anxiety was the same during his periods of sobriety. *Id.* Tucker said that he was not interested in quitting. *Id*. The doctor discussed the effects of alcohol with Tucker, and noted that Tucker's options for treatment were limited due to his continued use of alcohol. *Id.* The physician renewed Tucker's prescription for Celexa. *Id.*

At an appointment with the FCS physician on April 17, 2006, Tucker reported that he had gone to St. John Medical Center for detox on March 14, 2006, and had been sober since that time. (R. 235). Tucker had been started on Vistaril for anxiety, as well as a medication for hypertension, and the FCS physician continued these medications, along with Celexa. *Id.*

The FCS records contain an unsigned treatment plan dated May 16, 2006. (R. 274-86). Tucker's Axis I diagnoses were generalized anxiety disorder, panic disorder without agoraphobia, alcohol dependence, and alcohol abuse. (R. 274, 282). His GAF was 47. (R. 284).

A Mental Status Form dated August 8, 2006 was executed by Tucker's FCS physician. (R. 271). The form stated that Tucker reported that he had anxiety if he was around more than one person. *Id*. Tucker said that he tended to the care of his roommate's pets daily, but needed a reminder to feed them. *Id*. The form said that pharmacological management, case management, and individual rehabilitation were recommended treatments, and that Tucker's prognosis was fair if he maintained treatment. *Id.* The form reported that Tucker said that he could carry out simple instructions. *Id.* Tucker reported that he could not remember complex instructions. *Id*. The form stated Tucker's diagnoses as generalized anxiety disorder and panic disorder without agoraphobia. *Id*.

Tucker was seen by Kristy Griffith, M.D. at FCS on September 1, 2006 for medication management.  (R. 288).  Tucker reported that he was "doing fairly well," Celexa was helping him, and he was staying sober.  *Id.*  The doctor diagnosed Tucker with generalized anxiety disorder, panic disorder without agoraphobia, and alcohol dependence, in early full remission.  *Id.*  Dr. Griffith continued Tucker's Celexa and increased his blood pressure medication.  *Id.*

Tucker saw a case manager at FCS on June 19, 2007, and she noted a "tense affect and mood."  (R. 305).  Tucker reported that he had difficulty walking due to his arthritis and that he had no money to pay a doctor.  *Id.*  The case manager gave him referrals to receive indigent medical treatment.  *Id.*

On August 30, 2007, Tucker saw Jeffrey Cates, D.O., at FCS and reported that he was doing poorly and did not have medications.  (R. 306).  He reported that he experienced anxiety, irritability, stress, and difficulty being in crowds.  *Id*.  His sleep was poor, and he had low energy. *Id*.  Dr. Cates prescribed a resumption of Celexa, and he started Inderal for anxiety and blood pressure, and Trazadone for sleep.  *Id.*

Tucker saw Tracy Loper, M.D., at FCS on December 14, 2007.  (R. 292, 320).  Tucker reported that he was attending church and was able to socialize.  *Id*.  He told Dr. Loper that his medications were helping him with his symptoms of anxiety and insomnia.  *Id.*  Dr. Loper diagnosed Tucker with generalized anxiety disorder, panic disorder without agoraphobia, and alcohol dependence, with sustained full remission, noting sobriety since March 2006.  *Id.*  The physician also made notes to rule out a diagnosis of major depressive disorder, and to rule out social phobia.  *Id.*  Tucker's medications were continued.  *Id.*

The record contains an unsigned FCS treatment plan also dated December 14, 2007.  (R. 294-303, 318-19).  The treatment plan reflects that Tucker's Axis I diagnoses were generalized

anxiety, panic disorder without agoraphobia, and alcohol dependence.  (R. 301).  His GAF was

stated as 33 in one place, and as 45 on another page.  (R. 302, 319).

Tucker told Dr. Cates during his February 1, 2008 appointment that he was doing well and

that he had been compliant with his medications.  (R. 293, 317).  He reported that he drank 1-2

beers socially and that it helped calm his nerves.  *Id.*  Dr. Cates diagnosed Tucker with

generalized anxiety disorder, panic disorder without agoraphobia, and alcohol dependence.  *Id.*  It

appears that Dr. Cates' diagnosis questioned if Tucker had an alcohol relapse.  *Id.*  Dr. Cates

included the previous notes to rule out major depressive disorder and social phobia.  *Id.*  He

increased Tucker's Inderal so that he could take an extra pill as needed for social anxiety.  *Id*.  Dr.

Cates planned to increase Celexa in the future if Tucker continued to have anxiety in social

settings.  *Id.*

Agency consultant Angelo Dalessandro, D.O., examined Tucker on March 8, 2006.  (R.

205-13).  Tucker reported that he had pain in his elbows, ankles, and lower back.  (R. 205-06).

Tucker complained of pain and numbness in both his feet.  *Id.*  He said that walking and standing

aggravated the pain in his ankles and feet.  *Id.*  Tucker said he had rheumatoid arthritis.  (R. 206).

He told Dr. Dalessandro that he occasionally had shortness of breath on exertion.  (R. 205-06).

Tucker reported that he had high blood pressure, indigestion, heartburn, chronic fatigue, and

occipital headaches.  (R. 206).  He additionally reported that he had difficulty sleeping, and that he

was nervous and depressed.  *Id.*  Tucker reported that he drank socially, and that he dipped

tobacco.  (R. 205).

Dr. Dalessandro found bilateral tenderness in Tucker's elbows and his ankles, with normal

range of motion of those joints.  (R. 206).  Tucker had bilateral lumbodorsal tenderness, together

with pain and reduced range of motion on flexion and extension of his back.  (R. 206, 211, 213).

Tucker's gross and fine manipulation were normal.  (R. 207, 210).  Tucker's evaluated grip

strength was 35 kg on his right hand, and 37 kg on his left hand.  (R. 207).  There were no joint

deformities or swellings.  *Id*.

Dr. Dalessandro stated his impressions as follows:

1. Rule out rheumatoid arthritis by history.
2. Alcohol abuse revealed by history.
3. Manic depressive bipolar disorder.
4. Post status seizures due to withdrawal of [] benzodiazepine.

*Id.*  In his evaluation of Tucker's seizure disorder, he wrote that Tucker's seizures in 2005

occurred when Tucker was withdrawing from Xanax.  (R. 209).  He noted that Tucker was not

being treated for a seizure disorder.  *Id.*

Agency nonexamining consultant Luther Woodcock, MD., filled out a Physical Residual

Functional Capacity Assessment May 16, 2006.  (R. 263-70).  Dr. Woodcock listed Tucker's

impairments as arthritis, back pain, and hypertension.  (R. 263).  He identified that Tucker had the

ability to occasionally lift and/or carry 50 pounds, and to frequently lift and/or carry 25 pounds.

(R. 264).  He found that Tucker could sit, stand, and/or walk for 6 hours in an 8-hour workday,

and that he would have unlimited ability to use his hands and/or feet for push and/or pull motions.

*Id*.  In the space for narrative explanation, Dr. Woodcock reviewed Tucker's complaints of

rheumatoid arthritis and other pain, and he briefly summarized Dr. Dalessandro's report.  *Id.*  Dr.

Woodcock found that Tucker would be occasionally limited in his ability to stoop.  (R. 265).  He

found Tucker had no other physical limitations.  (R. 266-69).

Agency consultant Michael D. Morgan, Psy. D., conducted a psychological examination of

Tucker on May 2, 2006.  (R. 240-44).  During the interview, Tucker told Dr. Morgan that he had

mental problems and had difficulty controlling his temper.  (R. 240).  He said he had a poor work

history because of his temper.  *Id*.  He said he could not handle pressure and that he was nervous

and stressed in situations involving more than one person.  *Id.*  Tucker reported that he began to

experience panic attacks when he was 19 years old.  (R. 242).  During a panic attack, Tucker's

heart would race, he would sweat and tremble, and he felt short of breath, dizzy, lightheaded, and

hot.  *Id*.  In his mid-20s, Tucker started to have uncontrollable worry.  *Id.*  He said that he had

restlessness, fatigue, irritability, difficulty falling and staying asleep, difficulty concentrating, and

muscle tension.  *Id.*  He reported health problems due to rheumatoid arthritis and his blood

pressure.  *Id.*  Tucker said that his mental and physical impairments kept him from working.  *Id.*

He additionally told Dr. Morgan that his last job was too strenuous and that he could not manage

the pressure of being around people.  (R. 241).  Tucker reported he maintained three friendships

and that he played video games, watched television, read, and cared for his dogs.  *Id*.  Tucker

reported that he felt lonely and hopeless because of his loss of ability to function.  (R. 243).

Dr. Morgan administered the Mini Mental State Exam.  (R. 240, 242).  He stated that

Tucker's score of 30 on the exam was evidence that Tucker had no serious impairment in

concentration or memory at the time of the exam.  (R. 242).  Tucker's scores reflected that he had

a high-average level of intelligence.  (R. 243).  On Axis I, Dr. Morgan assessed generalized

anxiety disorder and alcohol dependence with physiological dependence, early full remission.  (R.

243).  He scored Tucker's GAF as 51-55.  *Id*.  During the examination, Dr. Morgan observed that

Tucker appeared anxious and demonstrated a sad affect.  (R. 242).  Dr. Morgan wrote that

Tucker's general motor behavior demonstrated he had psychomotor retardation.  (R. 240).  He

concluded that it was likely that Tucker could reach a higher level of psychological functioning

within two to three years with psychotherapy and with complete abstinence from alcohol.  (R.

243).

Cynthia Kampschaefer, Psy. D., an agency nonexamining consultant, completed a Psychiatric Review Technique form and Mental Residual Functional Capacity Assessment on May 15, 2006. (R. 245-61). For Listing 12.06, Dr. Kampschaefer noted Tucker's generalized anxiety disorder, not otherwise specified, and panic attacks. (R. 250). For Listing 12.09, Dr. Kampschaefer marked that Tucker had behavioral changes or physical changes associated with the regular use of substances that affect the central nervous system. (R. 253). For the "Paragraph B Criteria,"[4] Dr. Kampschaefer found that Tucker had moderate restriction of activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace, with no episodes of decompensation. (R. 255). In the Consultant's Notes portion of the form, Dr. Kampschaefer noted that Tucker was in treatment and on medications. (R. 257). She noted his 2005 hospitalization and seizures resulting from withdrawal. *Id.* She summarized Dr. Morgan's mental status examination and his diagnoses. *Id.* She summarized Tucker's activities of daily living, and she said that he had some restrictions of them. *Id.*

In her Mental Residual Functional Capacity Assessment, Dr. Kampschaefer found that Tucker was moderately limited in his ability to understand, remember, and carry out detailed instructions. (R. 259). She found Tucker to be markedly limited in his ability to interact appropriately with the general public. (R. 260). She found no other significant limitations. (R.

---

[4]There are broad categories known as the "Paragraph B Criteria" of the Listing of Impairments used to assess the severity of a mental impairment. The four categories are (1) restriction of activities of daily living, (2) difficulties in maintaining social functioning, (3) difficulties in maintaining concentration, persistence or pace, and (4) repeated episodes of decompensation, each of extended duration. Social Security Ruling ("SSR") 96-8p; 20 C.F.R. Part 404 Subpt P, App. 1 ("Listings") § 12.00C. *See also Carpenter v. Astrue*, 537 F.3d 1264, 1268-69 (10th Cir. 2008).

259-60).  Dr. Kampschaefer stated that Tucker could "understand, remember, and perform simple

instructions."  (R. 261).  She said that Tucker could relate to co-workers and supervisors.  *Id.*

### Procedural History

Tucker filed applications on August 18, 2005 seeking disability insurance benefits and

supplemental security income benefits under Titles II and XVI, 42 U.S.C. §§ 401 *et seq.*  (R. 92-

99).  Tucker alleged onset of disability as September 1, 2004.  (R. 92).  The applications were

denied initially and on reconsideration.  (R. 50-58, 60-65).  A hearing before ALJ Richard J.

Kallsnick, was held September 5, 2008 in Tulsa, Oklahoma.  (R. 19-43).  By decision dated

October 23, 2008, the ALJ found that Tucker was not disabled.  (R. 9-18).  On October 21, 2010,

the Appeals Council denied review of the ALJ's findings.  (R. 1-3).  Thus, the decision of the ALJ

represents the Commissioner's final decision for purposes of this appeal.  20 C.F.R. §§ 404.981,

416.1481.

### Social Security Law and Standard of Review

Disability under the Social Security Act is defined as the "inability to engage in any

substantial gainful activity by reason of any medically determinable physical or mental

impairment." 42 U.S.C. § 423(d)(1)(A).   A claimant is disabled under the Act only if his

"physical or mental impairment or impairments are of such severity that he is not only unable to

do his previous work but cannot, considering his age, education, and work experience, engage in

any other kind of substantial gainful work in the national economy."  42 U.S.C. § 423(d)(2)(A).

Social Security regulations implement a five-step sequential process to evaluate a disability claim.

20 C.F.R. § 404.1520.[5]  *See also Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988) (detailing

steps).  "If a determination can be made at any of the steps that a claimant is or is not disabled,

evaluation under a subsequent step is not necessary."  *Id.*

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. §

405(g).  This Court's review is limited to two inquiries: first, whether the decision was supported

by substantial evidence; and, second, whether the correct legal standards were applied.  *Hamlin v.*

*Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (quotation omitted).

Substantial evidence is such evidence as a reasonable mind might accept as adequate to

support a conclusion.  *Id.*  The court's review is based on the record taken as a whole, and the

court will "meticulously examine the record in order to determine if the evidence supporting the

agency's decision is substantial, taking 'into account whatever in the record fairly detracts from its

weight.'"  *Id., quoting Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994).  The court

"may neither reweigh the evidence nor substitute" its discretion for that of the Commissioner.

*Hamlin,* 365 F.3d at 1214 (quotation omitted).

---

[5]Step One requires the claimant to establish that he is not engaged in substantial gainful activity, as defined by 20 C.F.R. § 404.1510.  Step Two requires that the claimant establish that he has a medically severe impairment or combination of impairments that significantly limit his ability to do basic work activities.  *See* 20 C.F.R. § 404.1520(c).  If the claimant is engaged in substantial gainful activity (Step One) or if the claimant's impairment is not medically severe (Step Two), disability benefits are denied.  At Step Three, the claimant's impairment is compared with certain impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App.1 ("Listings").  A claimant suffering from a listed impairment or impairments "medically equivalent" to a listed impairment is determined to be disabled without further inquiry.  If not, the evaluation proceeds to Step Four, where the claimant must establish that he does not retain the residual functional capacity ("RFC") to perform his past relevant work.  If the claimant's Step Four burden is met, the burden shifts to the Commissioner to establish at Step Five that work exists in significant numbers in the national economy which the claimant, taking into account his age, education, work experience, and RFC, can perform.  *See Dikeman v. Halter*, 245 F.3d 1182, 1184 (10th Cir. 2001).  Disability benefits are denied if the Commissioner shows that the impairment which precluded the performance of past relevant work does not preclude alternative work. 20 C.F.R. § 404.1520.

### Decision of the Administrative Law Judge

The ALJ found that Tucker met insured status through December 31, 2009.  (R. 11).  At Step One, the ALJ found that Tucker had not engaged in any substantial gainful activity since his alleged onset date of September 1, 2004.  *Id.*  At Step Two, the ALJ found that Tucker had severe impairments of anxiety disorder, panic disorder, and arthritis.  *Id.*  At Step Three, the ALJ found that Tucker's impairments did not meet a Listing.  (R. 11-14).

The ALJ determined that Tucker had the RFC to perform medium work "except occasional stooping, simple instructions, cannot relate to the public, minimal adaptation to work situations but remain attentive and alert." (R. 14).  At Step Four, the ALJ found that Tucker was unable to perform any past relevant work.  (R. 16).  At Step Five, the ALJ found that there were jobs that Tucker could perform, taking into account his age, education, work experience, and RFC.  (R. 16-17).  Therefore, the ALJ found that Tucker was not disabled at any time from September 1, 2004 through the date of his decision.  (R. 17).

### Review

Tucker makes three arguments that the ALJ's decision should be reversed.  First, he faults the ALJ's Step Five finding for several reasons.  Second, Tucker argues that the ALJ did not properly consider the opinion evidence.  Third, Tucker faults the ALJ's credibility assessment. Regarding the issues raised by Tucker, the undersigned finds that the ALJ's decision is supported by substantial evidence and complies with legal requirements.  Therefore, the ALJ's decision is affirmed.

### Step Five Issues

Tucker first argues that the ALJ erred by failing to cite the strength demands in his hypothetical to the vocational expert (the "VE").  The ALJ stated in his hypothetical that the

individual had the capacity to perform a full range of medium, light, and sedentary work.  (R. 38).

The exertional requirements of medium, light, and sedentary work are defined at 20 C.F.R. §

416.967(c).  The VE testified that she understood the "elements" of those three categories of

work.  (R. 38).  The Tenth Circuit has rejected Tucker's argument and affirmed cases where the

ALJ used the defined exertional levels as part of the hypothetical asked of the VE.  *Qualls v.

Astrue*, 428 Fed. Appx. 841, 850-51 (10th Cir. 2011) (unpublished); *Rutledge v. Apfel*, 230 F.3d

1172, 1175 (10th Cir. 2000).  There was no error in the way the ALJ described the exertional

abilities in the hypothetical to the VE.

Next, Tucker complains that the ALJ did not ask the VE to explain any conflicts with the

Dictionary of Occupational Titles (the "DOT").  At Step Five, the burden shifts to the

Commissioner to show that there are jobs in significant numbers that the claimant can perform

taking into account his age, education, work experience and RFC.  *Haddock v. Apfel*, 196 F.3d

1084, 1088-89 (10th Cir. 1999).  The ALJ is allowed to do this through the testimony of a VE.  *Id.*

at 1089.  In *Haddock*, the Tenth Circuit ruled that  an ALJ must elicit testimony from a VE

regarding whether the VE's testimony conflicts with the DOT.  *Id.* at 1089-92.  If there is a

conflict, the ALJ must investigate it and elicit a reasonable explanation for the conflict before he

can rely on the testimony of the VE.  *Id.* at 1091-92.

Tucker is correct that the ALJ did not ask the VE if her testimony was consistent with the

DOT, and the ALJ should have made this inquiry.  *Poppa v. Astrue*, 569 F.3d 1167, 1173 (10th

Cir. 2009).  In *Poppa*, the Tenth Circuit reviewed the claimant's arguments that the VE's

testimony conflicted with the DOT, and the court rejected those arguments.  *Id.* at 1173-74.

"Because there were no conflicts between the VE's testimony and the DOT's job descriptions, the

ALJ's error in not inquiring about potential conflicts was harmless."  *Id.* at 1174.

In the present case, the VE testified to four jobs that were representative of jobs that a person with Tucker's RFC could do, and the ALJ relied upon these four jobs in his decision:

| | |
|---|---|
| medium janitorial work | DOT #381.687-014 |
| medium stock clerk | DOT #922.687-014 |
| light food preparation | DOT #311.472-010 |
| light production inspector | DOT #732.687-014 |

(R. 17, 39-40).  Tucker asserts that the DOT description of three of the four jobs are in conflict with the ALJ's ultimate RFC determination.  Plaintiff's Opening Brief, Dkt. #12, p. 3.  The Commissioner does not dispute this, but responds that Tucker does not assert any conflict with the production inspector job or assert that the production inspector job, by itself, does not satisfy the requirement of significant numbers of jobs at Step Five.  Response Brief, Dkt. #13, pp. 3-4.  The undersigned agrees with the Commissioner that, although the ALJ erred by not explicitly inquiring regarding conflicts with the DOT, that error was harmless because Tucker does not assert any conflict regarding the fourth job.  Moreover, the Court points out that the VE testified that the four jobs that she listed were a "representative sample."  (R. 40).  It therefore seems clear that, in accord with *Poppa*, the error of the ALJ in failing to inquire regarding conflicts with the DOT was harmless.[6]  *See also Conger v. Astrue*, 2011 WL 6881902 at *5-6 (10th Cir.) (unpublished).

While Tucker states his next argument as one related to the hypothetical to the VE, it is more properly viewed as an attack on the RFC determination.  Tucker complains that the ALJ found moderate limitations of social functioning and of concentration, persistence, or pace.  He

---

[6]The Commissioner cites *Shinseki v. Sanders*, 129 S. Ct. 1696, 1706 (2009) in support of his harmless error argument.  The undersigned has previously explained in detail his reluctance to apply *Sanders* in the Social Security disability context.  *Clark v. Astrue*, 2010 WL 3909883 (N.D. Okla.).  Here, *Poppa* gives sufficient authority to find harmless error, without need to resort to *Sanders*.  *See also Armijo v. Astrue*, 385 Fed. Appx. 789, 792 n.4 (10th Cir. 2010) (unpublished) (rejecting, on other grounds, harmless error standard drawn from outside the Social Security context).

then states that the ALJ failed to include any of these limitations in the hypothetical to the VE.  To the contrary, the ALJ's RFC, and his hypothetical to the VE, included a limitation to "simple instructions" and an inability to relate to the public.  (R. 14, 38-39).  The ALJ also included a statement that the claimant would "remain attentive and be alert."  *Id.*  While Tucker seems to assert that even more limitations relating to social functioning and concentration, persistence, or pace should have been included, the ALJ's RFC determination, and therefore his hypothetical question to the VE, is supported by substantial evidence.  *See Nixon v. Barnhart*, 49 Fed. Appx. 254, 256 (10th Cir. 2002) (unpublished) (ALJ's RFC determination adequately accounted for the claimant's deficiencies of concentration, persistence or pace as found on the Psychiatric Review Technique form); *Heinritz v. Barnhart*, 191 Fed. Appx. 718, 721-22 (10th Cir. 2006) (unpublished) (ALJ's RFC was supported by substantial evidence even when consultants found the claimant had marked limitation of concentration, persistence, or pace on the Psychiatric Review Technique form).

Tucker complains that wording related to his ability to adapt to work situations was not the same in the hypothetical to the VE and in the RFC determination.  The ALJ's hypothetical stated in part that the claimant "can relate to coworkers and supervisors for work related purposes, but not the general public.  Minimal contact with the general public, and he could adapt to a work situation under these limitations."  (R. 38-39).  In his RFC determination, the ALJ stated that Tucker could do medium work, "except occasional stooping, simple instructions, cannot relate to the public, minimal adaptation to work situations but remain attentive and be alert."  (R. 14).  Tucker asserts that the wording of the hypothetical and the wording of the RFC "are not even remotely similar" and that the VE's testimony might have been different if the hypothetical's wording had matched the language of the RFC.  Plaintiff's Opening Brief, Dkt. #12, p. 4.  The

undersigned disagrees with Tucker's characterization and finds that any discrepancy in the wording of the RFC and the hypothetical to the VE was "minor enough not to undermine confidence in the determination of this case." *Talamantes v. Astrue*, 370 Fed. Appx. 955, 959 (10th Cir. 2010) (unpublished), *quoting Gay v. Sullivan*, 986 F.2d 1336, 1341 n.3 (10th Cir. 1993). In *Talamantes*, the hypothetical to the VE had included "the opportunity to alternate positions between sitting and standing," and the RFC had included the "ability to alternate positions as needed." *Talamantes*, 370 Fed. Appx. at 959. The undersigned finds *Talamantes* to be applicable here to the difference in wording regarding Tucker's ability to adapt to work situations.

The undersigned finds no error at Step Five of the ALJ's decision.

**Opinion Evidence**

In this section of his brief, Tucker first asserts that the ALJ ignored the opinion evidence of Dr. Kampschaefer, as stated in the Paragraph B Criteria of the Psychiatric Review Technique form, that Tucker had moderate restrictions in his activities of daily living. (R. 255). The ALJ found only a mild restriction. (R. 14). The Tenth Circuit recently rejected this argument from Tucker's counsel in a different case. *Barber v. Astrue*, 431 Fed. Appx. 709, 712 (10th Cir. 2011) (unpublished).

> Although the ALJ's severity ratings differed from Dr. Kampschaefer's opinion, the ALJ ultimately endorsed her opinion in his final RFC assessment. Indeed, Dr. Kampschaefer believed [the claimant] could perform simple tasks and relate on a superficial and incidental basis due to his problems with authority and aggression; accordingly, the ALJ limited [the claimant] to simple, repetitive work in a habituated and object-oriented environment, with little or no interpersonal contact with coworkers or the public. Under these circumstances, no further explanation was necessary.

*Id.* Here, as in *Barber*, the ALJ ultimately adopted the opinion of Dr. Kampschaefer when he

made his RFC determination,[7] and therefore no further explanation regarding the differences in severity ratings in the Paragraph B Criteria was necessary.

Tucker argues that the ALJ erred by failing to note the internal inconsistency of Dr. Kampschaefer's report. In the Mental Residual Functional Capacity Assessment, Dr. Kampschaefer found no significant limitation in Tucker's ability to maintain attention and concentration for extended periods. (R. 259). Tucker argues that this is internally inconsistent with the Paragraph B Criteria finding in the Psychiatric Review Technique form that Tucker had a moderate limitation in maintaining concentration, persistence, or pace. (R. 255). A one-for-one correlation of those two items would be absurd, given the different structure and purpose of the two forms. The Paragraph B Criteria are only 4 broad categories, while the Mental Residual Functional Capacity Assessment includes 20 different specific functions that are listed under headings of "understanding and memory," "sustained concentration and persistence," "social interaction," and "adaptation." For the Paragraph B Criteria, Dr. Kampschaefer found that Tucker had a moderate restriction in the broad category of concentration, persistence, or pace, but that does not mean that she was required to find an impairment in all eight of the specific functions listed under the heading of "sustained concentration and persistence" on the Mental Residual Functional Capacity Assessment form. It was Dr. Kampschaefer's job to find which specific functions were implicated by Tucker's concentration issues, and she made that finding: that Tucker was moderately limited in his ability to understand, remember, and carry out detailed

---

[7]Tucker is correct that the ALJ did not explicitly discuss or reference Dr. Kampschaefer's reports, but it is evident that he adopted the functional limitations that she found. *See, e.g., Luttrell v. Astrue*, 2011 WL 6739432 at *4 (10th Cir. 2011) (unpublished) (reviewing court could infer the specifics when the ALJ's reasoning, relying on the opinion evidence of the consulting examiner, was clear).

instructions.  (R. 259-60).   That Dr. Kampschaefer's opinion did not include the other specific

function identified by Tucker is not a conflict in her opinion evidence.  *Heinritz*, 191 Fed. Appx.

at 721-22 (finding only three of twenty specific mental activities were impaired on the Mental

Residual Functional Capacity Assessment was not inconsistent with a finding that the claimant

had marked limitation of concentration, persistence, or pace on the Psychiatric Review Technique

form); *Norris v. Barnhart*, 197 Fed. Appx. 771, 775 (10th Cir. 2007) (unpublished) (separate

measures on Mental Residual Functional Capacity Assessment form did not conflict with

examining consultant's opinion evidence).  Tucker's argument on this point has no merit.

    Tucker also complains that the ALJ ignored the testimony of the VE related to Tucker's

GAF scores.  Plaintiff's Opening Brief, Dkt. #12, p. 5-6.  This argument, too, was rejected by the

Tenth Circuit in *Luttrell*.  Tucker's counsel in *Luttrell* argued that the ALJ ignored the VE's

testimony that the claimant could not work given her GAF scores.  *Luttrell*, 2011 WL 6739432 at

*3.  The Tenth Circuit explained that the ALJ was not required to adopt the GAF scores "which

are clearly inconsistent with the more specific mental limitations the ALJ found on the basis of

[the consulting expert's report]."  *Id.*  Here, the ALJ specifically discussed the GAF scores and

gave reasons for giving them reduced weight.  (R. 16).  The ALJ therefore considered the GAF

scores and, as was true in *Luttrell*, the circumstances of the present case were not such that the

ALJ was required to adopt them.  Therefore, the ALJ was entitled to ignore the testimony of the

VE that was predicated on GAF scores that the ALJ did not adopt.  *Luttrell*, 2011 WL 6739432 at

*3.

    Tucker's last argument in this section of his brief is equally unavailing.  Tucker complains

that the ALJ did not properly weigh the Mental Status Form completed by an FCS physician.  (R.

271).  Tucker refers to this as an RFC evaluation, and also refers to it as a treating physician

opinion, but the undersigned agrees with the Commissioner that this form does not constitute true

opinion evidence.  The Tenth Circuit in *Cowan v. Astrue,* 552 F.3d 1182, 1188-89 (10th Cir.

2008) explained that a "true medical opinion" was one that contained a doctor's "judgment about

the nature and severity of [the claimant's] physical limitations, or any information about what

activities [the claimant] could still perform."  Here, the Mental Status Form did not give opinions

as to Tucker's limitations or abilities.  Instead, almost all of the information on the form begins

with "participant reports," such as this partial response to a question on the form regarding

whether Tucker could remember, comprehend and carry out simple or complex instructions:

"Participant reports that he cannot remember complex instructions."  (R. 271).  From this

wording, it is evident that the form reflects Tucker's subjective complaints rather than medical

opinions.  The ALJ referenced the form in his decision.  (R. 15).  Under these circumstances, the

ALJ was not required to do more, because the Mental Status Form was not a treating physician

opinion.  *See Freeman v. Astrue*, 441 Fed. Appx. 571, 574 (10th Cir. 2011) (unpublished) (when

it was clear from ALJ's decision that she did not consider report to be that of a treating physician,

ALJ was only required to consider the report).

The ALJ committed no reversible error regarding medical opinion evidence.

**Credibility Assessment**

Credibility determinations by the trier of fact are given great deference.  *Hamilton v.*

*Secretary of Health & Human Services,* 961 F.2d 1495, 1499 (10th Cir. 1992).

> The ALJ enjoys an institutional advantage in making [credibility determinations].
> Not only does an ALJ see far more social security cases than do appellate judges,
> [the ALJ] is uniquely able to observe the demeanor and gauge the physical abilities
> of the claimant in a direct and unmediated fashion.

*White v. Barnhart,* 287 F.3d 903, 910 (10th Cir. 2002).  In evaluating credibility, an ALJ must

give specific reasons that are closely linked to substantial evidence.  *See Kepler v. Chater*, 68 F.3d

387, 391 (10th Cir. 1995); Social Security Ruling 96-7p, 1996 WL 374186.

In his decision, the ALJ first found[8] that Tucker's "allegations of rheumatoid arthritis are inconsequential and not really mentioned in the objective medical evidence." (R. 16). Tucker asserts that this is a "glaring inconsistency" with the ALJ's Step Two decision that Tucker's rheumatoid arthritis was a severe impairment, but the undersigned disagrees with this characterization.[9] Tucker himself testified that his mental impairments caused him the greatest amount of difficulty. (R. 36). Tucker began seeing Dr. Sokkar in 2004 and received Xanax for his anxiety, but there are no corresponding objective medical records showing that Tucker sought treatment for his arthritis during the same time period. (R. 151-54). There is no mention of arthritis that this reviewer can find until Tucker complained to his case manager at FCS in June 2007 that he had difficulty walking due to his arthritis and had no money to pay a doctor. (R. 305). While the case manager made a referral so that Tucker could receive medical care from an agency that provides indigent care, there is no indication in the objective medical evidence that Tucker followed up on those referrals and sought treatment. Thus, this absence of evidence supports the ALJ's sentiment that there was not much objective medical evidence to support

---

[8] Tucker faults the introductory language used by the ALJ: "After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent that they are inconsistent with the above residual functional capacity assessment." While this language might have been "meaningless boilerplate," it was merely an introduction to the ALJ's analysis and was not harmful. *See Kruse v. Astrue*, 2011 WL 3648131 at *6 (10th Cir.) (unpublished) ("boilerplate language is insufficient to support a credibility determination only in the absence of a more thorough analysis").

[9] Tucker also cites to *Hayden v. Barnhart*, 374 F.3d 986, 990 (10th Cir. 2004) in support of this statement, but the undersigned does not find any part of *Hayden* that explains that once the ALJ has found a condition to be severe at Step Two, he can not later find the claimant to be less than fully credible if his complaints regarding that condition are not consistent.

Tucker's claim of disabling arthritis.  The failure to be diligent in seeking treatment for an impairment that the claimant asserts is disabling is a legitimate factor for the ALJ to cite in making a credibility assessment.  *Qualls v. Apfel*, 206 F.3d 1368, 1372-73 (10th Cir. 2000).

The ALJ next stated that Dr. Dalessandro found no evidence of rheumatoid arthritis at the consultative examination.  (R. 16).  Tucker rightly complains that the ALJ's statement is not correct, because there was some evidence in Dr. Dalessandro's report that could be interpreted as supporting a diagnosis of arthritis, such as the bilateral tenderness in Tucker's elbows and his ankles, and the bilateral lumbodorsal tenderness, together with pain and reduced range of motion on flexion and extension of his back.  (R. 206, 211, 213).  Evidence tending not to support a diagnosis of arthritis was normal range of motion in Tucker's elbows and ankles, normal gross and fine manipulation, and the lack of any joint deformities or swellings.  (R. 206-07, 210).  This mixed evidence appears to be reflected in the inconclusive way that Dr. Dalessandro wrote his first impression: "Rule out rheumatoid arthritis by history."  (R. 207).  Thus, while the ALJ's statement that Dr. Dalessandro's examination showed no evidence of arthritis was inaccurately absolute, it appears that Dr. Dalessandro also did not completely accept a diagnosis that Tucker definitely had arthritis.  His report certainly cannot be considered strong objective medical evidence supporting Tucker's claim.

Finally,[10] the ALJ found that Tucker's claim of memory problems was undercut by a lack

of objective medical evidence supporting that claim.  (R. 16).  Dr. Morgan's consultative

examination included a score of 30 by Tucker on the Mini Mental Status Exam, indicating no

serious impairment in concentration or memory.  (R. 242).  Tucker agrees that some of the

treating records describe his memory and concentration as "adequate," but he maintains that they

were not adequate enough for him to return to work.  The remainder of Tucker's discussion in this

paragraph of his brief relies upon his subjective complaints, and it therefore does not detract from

the ALJ's credibility assessment.[11]

Tucker ends with a paragraph that apparently is his assertion of positive factors that the

ALJ should have mentioned, but did not: limited activities of daily living, good work history,

attempt to return to work, and no reports by medical providers that Tucker exaggerated his

---

[10] The undersigned agrees with Tucker that another reason given by the ALJ to support his credibility assessment is not a legitimate one.  The ALJ stated that Tucker had a history of alcohol abuse and testified that he continued to consume a couple of beers with friends.  (R. 16). The ALJ then wrote that this was inconsistent with Tucker's statement that he feels compelled to drink a couple of beers.  *Id.*  As Tucker points out, these two statements are consistent with each other, and thus it is not clear why the ALJ believed that these two statements supported a finding that Tucker was less than fully credible.  Perhaps this portion of the ALJ's decision became garbled during the writing or editing process, but the Court cannot supply reasons that are not clear in the ALJ's decision.  *See Haga v. Astrue*, 482 F.3d 1205, 1207-08 (10th Cir. 2007) (reviewing court "may not create or adopt post-hoc rationalizations to support the ALJ's decision that are not apparent from the ALJ's decision itself).  Despite this one invalid reason, the ALJ's credibility assessment remains supported by substantial evidence.  *See, e.g., Lax v. Astrue*, 489 F.3d 1080, 1089 (10th Cir. 2007) (ALJ's credibility assessment was supported by substantial evidence even though ALJ erroneously stated that "large variations" in IQ testing undermined its validity).

[11] Tucker discussed the GAF scores and medical evidence at this point, presumably because the ALJ continued the paragraph that contained his credibility assessment with a discussion of those points.  (R. 16).  The undersigned views the ALJ's discussion of GAF scores as separate from the credibility assessment and finds that Tucker's points do not relate to credibility and do not need to be discussed.

symptoms.  Plaintiff's Opening Brief, Dkt. #12, p. 9.  A claimant made a similar argument in a Tenth Circuit case, listing "certain pieces of favorable evidence."  *Stokes v. Astrue*, 274 Fed. Appx. 675, 685-86 (10th Cir. 2008) (unpublished).  The Tenth Circuit said that the only question it needed to consider was whether the ALJ's adverse credibility assessment "was closely and affirmatively linked to evidence that a reasonable mind might accept as adequate to support that conclusion."  *Id.* at 686.  The Tenth Circuit found no reason to overturn the ALJ's credibility determination.  *Id.*  This Court also finds that the ALJ's credibility assessment was closely and affirmatively linked to evidence that supported the conclusion that Tucker was not fully credible.

## Conclusion

The decision of the Commissioner is supported by substantial evidence and the correct legal standards were applied.  The decision is **AFFIRMED**.

Dated this 14th day of March, 2012.

Paul J. Cleary
United States Magistrate Judge